**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| STEVEN HUNTER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-11-3408 |
| | § | |
| UNION PACIFIC RAILROAD COMPANY, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**MEMORANDUM AND OPINION**

Steven Hunter sued his former employer, Union Pacific Railroad Company, alleging race discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Hunter, who is African-American, contends that Union Pacific discriminated when it removed him from service after he went home instead of taking a scheduled drug test and, after reinstating him, fired him several months later when he took and failed a second drug test. Union Pacific has moved for summary judgment on Hunter's discrimination claims under both Title VII and § 1981. (Docket Entry No. 20). Based on the pleadings; the motion, response, reply, and surreply; the record; and the relevant law, Union Pacific's motion for summary judgment is granted. Final judgment is entered by separate order. The reasons are explained below.

**I.    Background**

Union Pacific's written drug and alcohol policy prohibits employees from using alcohol while on duty and from using controlled substances at all times. (Docket Entry Nos. 20, Ex. D at 4; 21, Ex. 2). The policy incorporates federal Department of Transportation regulations. Employees are subject to both random and reasonable suspicion drug testing. (*Id.* at 8–10). An employee

selected to take a random drug test "must provide the required breath and urine specimens." (*Id*. at 10). Compliance is excused only if there is "a documented medical or family emergency." (*Id*.). Every laboratory-reported drug test result is reviewed by a Medical Review Officer (MRO). The MRO verifies the result, makes a reasonable effort to contact the employee tested, and gives the employee an opportunity to discuss the result. If the MRO finds that there is a legitimate medical explanation for a positive test result, the MRO reports the result as negative. If the MRO verifies a positive result, the MRO instructs the employee not to report for service and gives that result to Union Pacific. (*Id*. at 11).

Employees who refuse to take a drug test are removed from service and subject to discipline "up to and including dismissal." (*Id*. at 13). An employee is considered to have refused a drug test if the employee "fails to remain at the testing site until the testing process is complete" or "fails to provide a urine specimen" within three hours. (*Id*. at 12). An employee who has been dismissed for violating the drug and alcohol policy is allowed a one-time return to service after completing a rehabilitation program approved by Union Pacific's Employee Assistance Program (EAP). An employee who has been granted a one-time return to service and who violates the drug and alcohol policy a second time within a ten-year period is dismissed permanently. An employee dismissed for refusing a test is not allowed to take part in the Employee Assistance Program. (*Id*. at 13, 16). Reinstated employees are subject to return-to-duty and follow-up testing during a probationary period.

Hunter was a car foreman who had worked for Union Pacific since September 1989. (Docket Entry No. 20, Ex. A at 4–5). On October 10, 2009, Hunter was told to report to a manager's office just before midnight. When he arrived, a person who identified himself as a drug tester told Hunter

2

that he would be required to take a urinalysis test. (Docket Entry No. 21, Ex. A at 2). Hunter refused to take the drug test, stating that he did so because no manager was present. (*Id.*, Ex. A at 2).

When Hunter left the building, he saw a supervisor, Jason Wood. Hunter told Wood that he was not feeling well and planned to leave. (*Id.*, Ex. A at 2). According to Hunter, Wood said that he could leave and did not tell him that he would be disciplined if he did not take the drug test. (*Id.*). Wood testified in a deposition that he saw Hunter as he was in his truck about to leave. Hunter told Wood that the company was "trying to set me up." (*Id.*, Ex. B at 10). Wood did not tell Hunter the consequences of not taking the drug test. (*Id.*, Ex. A at 2). Hunter alleges that Wood was later disciplined for making a racially offensive remark at a company function. (*Id.*, Ex. B at 7–8).

Union Pacific removed Hunter from service for refusing to take the October 10 drug test. (*Id.* at 3). On October 13, 2009, Hunter obtained a doctor's note stating that he had been suffering from "flu-like symptoms" for the previous four days. (Docket Entry No. 21, Exs. A, 3). Hunter independently took another drug test and tested negative for all substances. (*Id.*, Exs. A, 4). Hunter then filed a grievance with his union alleging that Union Pacific had discriminated against him on the basis of his race. He alleged that Union Pacific had failed to follow its drug-testing policies and did not inform him of the consequences of declining to take the test. (Docket Entry No. 21, Ex. 5 at 39). A disciplinary hearing was scheduled for October 22, 2009. (Docket Entry No. 26, Ex. A at 1). The hearing was postponed to November 18, 2009, at the union's request. (*Id.* at 2).

Before the rescheduled hearing date, Union Pacific negotiated a "last chance" agreement with Hunter and his union representative. (Docket Entry No. 20, Ex. A at 8–10). Under the agreement, Hunter agreed to "waive his right to an investigation" of Union Pacific's allegations that

3

he had refused to take a drug test "and accept dismissal from service as discipline for the rule violations . . . and his personal record will be corrected to so reflect." After completing testing and, if necessary, treatment, Hunter could return to work on a probationary basis for 18 months. If Hunter violated the company's drug and alcohol policy during the probationary period, he could be removed from service with no right to a formal investigation. Hunter also agreed that if he violated company policies in the future, he would not be able to take advantage of the "one-time return to work companion agreement." (Docket Entry No. 20, Ex. A at 17– 18). Hunter agreed to submit to follow-up drug testing. (*Id.* at 3).

Hunter has submitted the deposition testimony of Drew Duncan, another African-American Union Pacific employee. Duncan testified that he believed that Union Pacific's drug-testing was not random. Duncan said that he and another African-American employee met with two managers, Sal Perez and Ronald Lewis, and complained that they were being tested more frequently than white employees. Lewis told them that they had been tested because their "number was coming up in the computer." (Docket Entry No. 21, Ex. C at 20). At the meeting, one of the two managers said, "Look at it this way, you guys are clean." (*Id.* at 21). Duncan interpreted this statement as "a roundabout way of saying" that African-Americans were tested more frequently because they would pass. (*Id.* at 22). After the meeting, Duncan was not tested again. (*Id.* at 26).

Ronald Lewis stated in an affidavit that he "play[s] no role in deciding which of my employees is selected for a random drug test" and that Union Pacific's Drug and Alcohol Testing group in Omaha, Nebraska decides which employees are selected for random drug testing. (Docket Entry No. 20, Ex. C). Lewis also testified that he did not make the decision to remove Hunter from service in October 2009 or to offer him the "last chance" agreement. Hunter testified that before

October 2009, Union Pacific had never called him to take a random drug test.

On April 28, 2010, after Hunter was reinstated, he was called in for a drug test. Hunter acknowledges that the test was performed according to Union Pacific's policies and procedures. (Docket Entry No. 21, Ex. A at 3). On May 5, 2010, a Medical Review Officer (MRO) verified a positive result for cocaine. (Docket Entry No. 20, Ex. B at 5). The MRO notified Hunter of the positive result. (Docket Entry No. 20, Ex. A at 12).

Hunter stated that he has not used cocaine since 1974 and that the positive result was due to his drinking Inca tea, a legal substance. (Docket Entry No. 20, Ex. A at 16; Docket Entry No. 21, Ex. A at 4–5). After his positive test, Hunter went to another laboratory and took drug tests both before and after drinking Inca tea, while under observation. (*Id.* at 4). Before drinking the tea, he tested negative for all substances. (*Id.*, Ex. 8). After drinking the tea, he tested positive for cocaine. (*Id.*, Ex. 9). Hunter submitted a toxicology report by Dr. Amitava Dasgupta stating that Hunter's test results were consistent with drinking Inca tea. (Docket Entry No. 21, Ex. 12). Hunter called the MRO to explain that the positive result was due to the Inca tea. (Docket Entry No. 21, Ex. A at 4); (Docket Entry No. 21, Ex. 10 at 50–51). The MRO declined to change the positive test result. She stated in an affidavit that she was prohibited by federal regulations from accepting an explanation that coca-tea consumption accounted for the positive cocaine test as the basis to verifying that the test was in fact negative. (Docket Entry No. 20, Ex. B). Union Pacific terminated Hunter's employment because his positive drug test violated the drug and alcohol policy and the parties' "last chance" agreement. (Docket Entry No. 21, Ex. A at 4 ).

Hunter contends that by firing him for failing the drug test, Union Pacific treated him differently than other non-black employees. Hunter points to two white Union Pacific employees

5

who he contends were treated less severely. Those employees' names have been redacted, and they are referred to in the record as Employee X and Employee Z. Employee Z was found to have violated Union Pacific's policy for alcohol use in 2007 and cocaine use in 2008, and was fired after his second violation. (Docket Entry Nos. 21, Exs. 7; 26 Ex. D). Employee X was found to have violated Union Pacific's policy for alcohol use in both 1991 and 2003, but was not fired. (Docket Entry No. 21, Ex. 11).

On November 23, 2010, Hunter filed an EEOC charge alleging race discrimination. (Docket Entry No. 20, Ex. A at 20). On September 19, 2011, he sued Union Pacific under Title VII and § 1981. (Docket Entry No. 1). Union Pacific filed a motion for summary judgment on March 8, 2013, (Docket Entry No. 20), and Hunter responded, (Docket Entry No. 21).

## II.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect

the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.,* 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little,* 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

**III.   Discussion**

   **A.   The Race Discrimination Claims**

Race discrimination claims under § 1981 and disparate treatment claims Title VII require a plaintiff to prove intentional discrimination and are considered under the same standard. *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010) (citing *Pegram v. Honeywell, Inc.*, 261 F.3d 272, 281 n.7 (5th Cir. 2004)); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 408 (5th Cir. 2002). Intentional discrimination can be established through either direct or circumstantial evidence. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). When, as here, a plaintiff attempts to prove discrimination through indirect or circumstantial evidence, the claims are

considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of discrimination. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011); *see also McDonnell Douglas*, 411 U.S. at 802. The elements of a *prima facie* showing are that the plaintiff: (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class or, in the case of disparate treatment, was treated more harshly than others who were similarly situated. *Bouie v. Equistar Chems. LP*, 188 F. App'x 233, 236–37 (5th Cir. 2006); *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the employer sustains its burden, the *prima facie* case dissolves, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic. *Vaughn*, 665 F.3d at 636 (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)). In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus. *Rachid*, 376 F.3d at 312.

### 1. The October 2009 Drug Test

Hunter argues that Union Pacific discriminated against him by testing him for drugs in October 2009 and by removing him from service after he refused to take the test. (Docket Entry No.

8

21 at 17).[1] Union Pacific asserts that it tested Hunter in October 2009 as part of its required drug-testing regime. Hunter responds that Union Pacific's asserted reasons were pretextual and that the company tested blacks more frequently than whites.

Pretext can be shown either "through evidence of disparate treatment," or by evidence that the "proffered explanation is false or unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (internal quotation marks and citation omitted). *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011). Disparate treatment requires evidence that an employer treated similarly situated employees differently for "nearly identical conduct."

Union Pacific moves for summary judgment on the grounds that its testing was random and that the company did not discriminate in its choice of who to test. It submitted an affidavit by Hunter's manager stating that he does not choose employees for the random drug tests and that all selections are made offsite and reported to him. As evidence of pretext, Hunter points to Duncan's deposition testimony. (Docket Entry No. 21, Ex. C). Duncan testified that when he approached his managers about his belief that black employees were being tested more frequently than whites, his manager told him that they were being selected because their "number was coming up in the computer." (Docket Entry No. 21, Ex. C at 12). Another manager told Duncan, "Look at it this way, you guys are clean." (*Id.* at 21). Duncan later told Hunter about the managers' comments, which Duncan stated that Hunter misinterpreted to mean that the managers had told him that they

---

[1] Hunter acknowledges that his Title VII claims arising out of the October 2009 drug test is untimely. (Docket Entry No. 21 at 8). A plaintiff has 300 days from an adverse employment action to file a claim with the EEOC. Hunter filed his EEOC complaint on November 23, 2010, more than 300 days before this lawsuit was filed. But Hunter's § 1981 claims are not subject to the same 300-day limitations period. "Federal civil rights actions brought under 42 U.S.C. § 1981, which lacks an express statute of limitations, are governed by the most closely analogous limitations period provided under state law." *Jones v. Alcoa, Inc.*, 339 F.3d 359, 364 (5th Cir. 2003). In Texas, the two-year limitations period for personal-injury actions applies. *Id.* Hunter's § 1981 claim arising out of the October 2009 drug test is not barred by limitations.

were testing blacks more frequently than whites.  Duncan testified that neither manager told him that.  "Testimony based on conjecture or speculation is insufficient to raise an issue of fact to defeat a summary judgment motion . . . ."  *Ruiz v. Whirlpool, Inc.*, 12 F.3d 510, 513 (5th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50).  Speculation by Duncan and Hunter about possible nonrandom drug testing procedures does not give rise to a fact dispute material to whether Union Pacific was testing black employees more frequently than whites.

Union Pacific proffered a legitimate nondiscriminatory reason for removing Hunter from service after he refused to take the October 2009 test.  Union Pacific's written policy, which incorporates federal regulations, states that "[f]ailure to provide a urine specimen within three hours for any drug test required . . . is considered refusal" and "[w]hen an employee refuses to participate in a drug or alcohol test, the employee will be removed from service and be subject to discipline, up to and including dismissal."  (Docket Entry No. 20, Ex. D at 15).  Following a company policy is a legitimate, nondiscriminatory reason for Union Pacific to remove Hunter from service.  *See Arrieta v. Yellow Transp., Inc.*, 2008 WL 5220569, at *8 (N.D. Tex. Dec. 12, 2008) (holding that a violation of company policy in missing a drug test, which under company policy was considered a refusal, was a legitimate, nondiscriminatory reason for discharging an employee).

Hunter argues that Union Pacific's reasons for dismissing him after he refused the October 2009 test were pretextual because company policy required that a manager be present during the test.  The policies Hunter points to do not reflect such a requirement.  Paragraph 9.3.2 of Union Pacific's Drug and Alcohol Policy states that a "[d]etirmination of drug use must be made by two managers, at least one of whom is trained in accordance with 49 C.F.R. Part 219.11(g) and is on site."  (Docket Entry No. 20, Ex. D).  This rule applies only to drug testing based on reasonable suspicion or

reasonable cause. Hunter's test was random, and Union Pacific's policies for random tests do not require a manager to be present during testing.

Hunter also points to the "donor instructions for drug tests." Although those instructions state, "You must cooperate with the railroad representative and the collector," they do not state that a railroad representative must be physically present during the sample collection. (Docket Entry No. 21, Ex. 2).

Even if Hunter is correct that Union Pacific failed to follow its testing procedures, this is not sufficient to give rise to an inference or fact dispute that he was subject to racially discriminatory disparate treatment. "A defendant's failure to follow its own policy is not probative of discriminatory animus in the absence of proof that the plaintiff was treated differently than other non-minority employees because Title VII does not protect employees from the arbitrary employment practices of their employer, only their discriminatory impact." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir. 2007) (quotation marks and citation omitted). Hunter has not pointed to any comparators or other evidence suggesting that Union Pacific followed the policies he cites for employees who were not African-American. Hunter has failed to show a fact dispute material to determining whether the nondiscriminatory reason Union Pacific proffered is pretextual.

Hunter contends that when he ran into a supervisor, Jason Wood, and said that he was not well and going home, Wood failed to tell him that he would be viewed as refusing to take a drug test. This does not raise a fact dispute. Hunter has not submitted or pointed to any evidence that Wood played a role in administering Union Pacific's drug-testing procedures or in deciding whether to remove Hunter from service. Nor has Hunter suggested that either of the two individuals who were

11

involved in his drug test — Lewis and the collector — told him that he was permitted to leave work without taking the test. Additionally, Union Pacific's "donor instructions for drug tests" warns, "Your test must begin immediately. There can be no delay for any reason. If you delay the test or if you don't cooperate, it will be considered refusal." (Docket Entry No. 21, Ex. 2). The instructions also state that "[t]he railroad will excuse compliance with the testing requirement only in case of a documented medical or family emergency, e.g., a life threatening condition." (*Id.*). Hunter has not shown that what he described as "flu-like symptoms" qualify as a life-threatening condition or other medical emergency preventing him from providing a urine sample.

Hunter points out that the "donor instructions" state, "You have every right to question and understand those requirements before, during, and after the testing process." (*Id.*). Those instructions do not state, however, that an employee may refuse to take a drug test because he has questions. Wood's conversation with Hunter does not create a fact dispute material to determining whether Union Pacific discriminated against him.

Hunter also points to evidence that months later, in November 2011, Wood made racially offensive comments at a company function. Union Pacific disciplined Wood for those comments, including by demoting him. (Docket Entry No. 20, Ex. B at 7). Such remarks do not support an inference that Hunter's October 2009 drug test was racially discriminatory. To be evidence of discrimination, workplace comments must be "'1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.'" *Barrientos v. City of Eagle Pass, Tex.*, 444 F. App'x 756, 758 (5th Cir. 2011) (quoting *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999)). Wood made the comments in

November 2011, long after Hunter's drug tests. The comments were not related to the decision to remove Hunter from service for declining the October 2009 test. (Docket Entry No. 21, Ex. B at 7). Hunter has also failed to point to any evidence that Wood was involved in having Hunter take the drug test or in removing him from service for refusing to do so. Wood's derogatory remarks are not evidence that Union Pacific discriminated against Hunter in testing him, considering his actions a refusal, or withdrawing him from service.

Summary judgment is granted on Hunter's discrimination claims arising out of the October 2009 drug test.

### 2. The April 2010 Drug Test

Union Pacific proffered legitimate nondiscriminatory reasons for testing Hunter in April 2010 and for terminating his employment after the test was reported and verified as positive for cocaine. Union Pacific contends that these decisions were consistent with its policies and with its "last chance" agreement with Hunter, which allowed Hunter to be fired without a disciplinary hearing if he had a positive drug test.

"[I]t is well settled that an employer's decision to deny employment or discipline employees based on positive drug test results constitutes a non-discriminatory business reason for the adverse employment action . . . ." *M.O.C.H.A. Soc., Inc. v. City of Buffalo*, 872 F. Supp. 2d 264, 295 (W.D.N.Y. 2012); *see also Fahey v. City of New York*, 2012 WL 413990, at *9 (E.D.N.Y. Feb. 7, 2012) ("[C]ourts consistently conclude that an employee's failure of a drug test constitutes a legitimate nondiscriminatory reason for terminating the employee, particularly where, as here, the employee's job involves the public.") (collecting cases).

Hunter does not dispute that his April 2010 test was positive for cocaine. He contends that

he did not use cocaine and that the positive test resulted from drinking Inca tea. Hunter argues that the MRO's refusal to accept his explanation for the positive test is evidence of pretext and that the real reason was discrimination. Union Pacific responds that the MRO was prohibited under federal regulations from accepting an explanation for a positive cocaine result based on coca tea. It points to 49 C.F.R. § 40.151(f), which applies to MROs who perform drug testing for a transportation employer. The regulation states: "You must not accept an assertion of consumption . . . of coca teas as a basis for verifying a cocaine test result as negative."[2] The MRO's reporting of Hunter's positive test in compliance with her legal obligations is not evidence of discrimination.

Hunter has also not pointed to any evidence supporting an inference that Union Pacific's decision to terminate him for testing positive was pretextual. "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995); *see also Bryant v. Compass Grp. USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (disregarding the plaintiff's claim of innocence because no evidence called into doubt the employer's good-faith suspicion that the employee stole from the employer). "[A] fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted on it in good faith." *Cervantez v. KMGP Servs. Co. Inc.*, 349 F. App'x 4, 10 (5th Cir. 2009) (footnote omitted); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 44 (2d Cir. 2000) ("Reasonable reliance by an employer on a laboratory test, even where misplaced, does not provide any basis for a jury to find pretext."); *Arrieta*, 2008 WL 5220569, at *9 ("The inquiry is not whether [the employee]

---

[2] 49 C.F.R. § 40.151(f) applies to certain transportation employees performing "safety-sensitive functions." Hunter does not contest that his position required him to perform safety-sensitive functions.

14

actually committed the alleged infraction, but whether [the employer] believed that he had and based its decision to discharge him on that belief."); *Hall v. Smurfit-Stone Container Enters.*, 2008 WL 3823252, at *4 (N.D. Tex. Aug. 14, 2008) (holding that an employee's failed drug tests were a legitimate, nondiscriminatory reason for job termination regardless of whether the positive result was caused by prescription drugs). Hunter has not pointed to any evidence suggesting that Union Pacific's belief that he had used cocaine was unreasonable in light of the positive drug test results.

Hunter has also failed to submit or point to any evidence suggesting that Union Pacific treated him less favorably than similarly situated employees outside the protected class. In alleging disparate treatment, "the misconduct for which the plaintiff was discharged [must be] nearly identical to that engaged in by other employees." *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.,* 245 F.3d 507, 514 (5th Cir. 2001) (quotations omitted). Hunter argues that he was treated less favorably than Employees X and Z, two white employees who he contends were not terminated after receiving multiple positive results in random drug tests. Hunter has not shown that Employees X and Z satisfy the "nearly identical" standard because he has not presented any evidence that the comparators refused a drug test or signed a "last chance" agreement. *See Jorden v. Potter*, 145 F. App'x 858, 859 (5th Cir. 2005) (holding that employees were not similarly situated because only the plaintiff was employed subject to a "last chance agreement"); *Briley v. Harvey*, 2006 WL 1517523, at *4 (S.D. Tex. May 30, 2006) (holding that employees were not similarly situated because the plaintiff had entered into an agreement with the company to keep his job but the comparator had not). Hunter has also not shown that Employees X and Z were treated more favorably than he was. Employee Z violated Union Pacific's policy for alcohol use in 2007 and cocaine use in 2008. Like Hunter, he was terminated after the second violation of Union Pacific's substance-abuse policy. Employee X

15

violated Union Pacific's policy for alcohol use in both 1991 and 2003. Employee X was not fired after his second violation because Union Pacific's substance-abuse policy has a ten-year look-back period and his violations occurred more than ten years apart.[3]

Because Hunter has not demonstrated a fact dispute material to determining disparate treatment or supporting an inference of disparate treatment, summary judgment is granted on his Title VII and § 1981 claims.

### B.    The Retaliation Claims

Union Pacific argues in its summary-judgment motion that Hunter did not assert retaliation claims in his complaint. (Docket Entry No. 20). In response, Hunter argued retaliation but did not respond to Union Pacific's contention that he failed to allege retaliation in his complaint. Hunter failed to plead any facts that, even loosely, tend to support a retaliation claim.

Union Pacific argues, in the alternative, that summary-judgment on retaliation is appropriate. It contends that Hunter's Title VII retaliation claim is barred because it was not asserted in his EEOC charge. Title VII plaintiffs are required to exhaust their remedies by filing a complaint with the EEOC before suing. "[T]he scope of the judicial complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *McClain v. Lufkin Indus.*, 519 F.3d 264, 274 (5th Cir. 2008) (citations omitted). In his EEOC

---

[3] Hunter objects to and moves to strike Union Pacific's Exhibits D and E attached to its summary-judgment reply. (Docket Entry No. 28). Exhibits D and E are HR records for Employees X and Z that show their employment status over time. Hunter asserts that Union Pacific failed to produce these records until it filed its summary-judgment reply even though they were responsive to Hunter's discovery requests. Hunter had an opportunity to respond to those exhibits in his surreply brief and has not shown that he was otherwise prejudiced by Union Pacific's late production. And granting the motion to strike would not benefit Hunter. As a Title VII plaintiff, Hunter has the burden to demonstrate that Union Pacific acted more favorably to non-black comparators. Without Exhibits D and E, there would be no record evidence showing the effect that positive test results had on the employment status of Employees X and Z.

charge, Hunter states that "[Union Pacific] discriminated against me in violation of Title VII of the Civil Rights Act of 1964, as amended based on my race (African American)." (Docket Entry No. 20, Ex. A at 23). Hunter did not check the EEOC complaint form box indicating that he was making a retaliation complaint and did not allege any facts suggesting that he believed that Union Pacific had retaliated against him. "[D]iscrimination and retaliation claims are distinct, and the allegation of one in an EEO charge does not exhaust a plaintiff's remedies as to the other." *Bouvier v. Northrup Grumman Ship Sys, Inc*., 350 F. App'x 917, 921 (5th Cir. 2009) (citing *Randel v. U.S. Dep't of Navy*, 157 F.3d 392, 395 (5th Cir. 1998)). Hunter failed to exhaust his remedies as to his Title VII retaliation claim.

Hunter's retaliations claims also fail because he has failed to create a fact dispute material to whether Union Pacific retaliated against him. Title VII prohibits an employer from retaliating against an employee "because [s]he has *opposed* any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or *participated* in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a) (emphasis added). Courts refer to the first part of Title VII's antiretaliation provision as the "opposition clause," and the second part as the "participation clause." *See, e.g.*, *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419 (5th Cir. 2000).

When, as here, a plaintiff seeks to prove retaliation through circumstantial evidence, he has the initial burden to make a *prima facie* case of retaliation. To make a *prima facie* case, a plaintiff must show that: (1) she was engaged in activity protected by Title VII; (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse action. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008); *see also Univ. of Tex. Sw.*

*Med. Ctr. v. Nassar*, No. 12-484, slip op. at 20, — U.S. — (June 24, 2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation. . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). If the plaintiff makes this showing, the burden then shifts to the employer to proffer a legitimate, non-retaliatory reason for its employment action. *Aryain*, 534 F.3d 473. If the employer satisfies its burden, the plaintiff then bears the burden of showing that the employer's reason is a pretext for the actual retaliatory reason. *Id.*

Union Pacific contends that Hunter has not pointed to any evidence establishing a causal link between conduct protected under Title VII's retaliation provision and an adverse employment action. Hunter asserts that "immediately after the fraudulent 'refusal' he complained to [Union Pacific] about discrimination"; that "Drew Duncan and others had complained about discrimination with regard to the drug tests"; and that Union Pacific fired Hunter "(boot strapping onto the refusal) for a false positive." (Docket Entry No. 21 at 18–19). Union Pacific's decision to remove Hunter from service could not have been retaliation for his opposition to race discrimination. Hunter did not file a complaint alleging that Union Pacific's administration of the October 2009 test was discriminatory until *after* he was told by Union Pacific that he would be removed from service for refusing to take the test. (Docket Entry No. 21, Ex. 5). And Hunter was reinstated on the condition that he agree to additional drug testing and a probationary period. Nor does Hunter point to any evidence suggesting that complaints about race discrimination were the "but-for" cause of his later termination, which came only after he tested positive for cocaine. Hunter failed to create a fact dispute material to his retaliation claims.

Hunter did not plead retaliation in his complaint. To the extent Hunter did plead such claims,

summary judgment is granted on Hunter's Title VII retaliation claim because Hunter failed to allege retaliation in his EEOC complaint. Summary judgment is also granted on Hunter's Title VII and § 1981 retaliation claims because Hunter failed to make a *prima facie* showing of retaliation.

## V.     Conclusion

For the reasons stated above, Union Pacific's motion for summary judgment is granted. Final judgment is separately entered.

SIGNED on June 25, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge